EXHIBIT 1

Case 1:25-cv-02603-BAH    Document 1-1    Filed 08/08/25    Page 2 of 47
eFiled
5/30/2025 5:15:13 PM
Superior Court
of the District of Columbia

## SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | |
|---|---|
| INTERNATIONAL RIGHTS ADVOCATES, INC., 621 Maryland Ave. NE, Washington, D.C. 20002, | |
| Plaintiff, | Case No. _____    2025-CAB-003482 |
| v. | **COMPLAINT** |
| NESTLÉ USA, INC., 1812 N. Moore St., Arlington, VA 22209, | |
| Defendant. | DEMAND FOR JURY TRIAL |

## PREAMBLE

On behalf of the general public of the District of Columbia, and in the interest of consumers, Plaintiff International Rights Advocates brings this action against Defendant Nestlé USA, Inc., concerning its false and deceptive marketing representations about the conditions under which the cocoa it uses in its confectionery and beverage products is produced in Côte d'Ivoire and Ghana. Nestlé makes false and deceptive marketing representations to D.C. consumers, including that Nestlé has "zero tolerance to child labor, forced labor and modern slavery"[1] and is "firmly opposed to all forms of child exploitation and [] committed to preventing and eliminating child labour wherever it occurs in [its] supply chain."[2] Nestlé makes statements like these despite having been aware for more than two decades that its cocoa is produced with child labor and human trafficking. Nestlé has repeatedly promised the public that it is putting an end to these abusive practices in its supply chain and moving towards sustainably sourced cocoa. But in reality, Nestlé continues to

---

[1] Nestlé, Corporate Business Principles 4 (2020), https://www.nestle.com/about/how-we-do-business/business-principles.

[2] Nestlé, Tackling Child Labour: 2017 Report 7 (2017), https://www.nestle.com/sites/default/files/asset-library/documents/creating-shared-value/responsible-sourcing/nestle-cocoa-plan-child-labour-2017-report.pdf.

profit from child labor and human trafficking while doing little to prevent these horrific practices.

Thus, consumers in the District are misled by Nestlé's representations concerning the use of child

labor and human trafficking in its supply chain.[3] This Complaint is on behalf of the general public

of the District of Columbia, in the interest of consumers. This is not a class action, and no class

certification will be sought. Plaintiff alleges the following based upon personal knowledge,

information, belief, and the investigation of Counsel:

## INTRODUCTION

1.      International Rights Advocates ("Plaintiff" or "IRAdvocates") brings this suit

under the District of Columbia Consumer Protection Procedure Act ("CPPA"), D.C. Code §§ 28-

3901–3913, against Nestlé USA, Inc. ("Defendant" or "Nestlé"), based on Nestlé's continued use

of cocoa produced by child labor and human trafficking despite its representations to the contrary.

2.      The use of fair and sustainable labor practices in supply chains, and in particular

the elimination of illegal child labor, is of growing concern to consumers.[4] Consumers increasingly

seek out products that are made without the use of child labor, forced labor, exploitative working

conditions, other human rights abuses, or environmentally damaging practices, especially in

industries notorious for such practices.

---

[3] *See Walker v. Nestlé USA, Inc.*, No. 3:19-CV-723-L-DEB, 2022 WL 901553, at *3 (S.D. Cal. Mar. 28, 2022) (finding there was a plausible claim that Nestlé misled consumers with its assertions that its cocoa was not harvested by child labor).

[4] The concept of "sustainability" is not only about protecting the environment; it also is heavily concerned with eliminating social and economic exploitation to ensure long-term prosperity. *See* G.A. Res. 70/1, at 1 (Sept. 25, 2015), https://docs.un.org/en/A/RES/70/1 (recognizing the "the three dimensions of sustainable development: the economic, social and environmental"). Because child labor "is an egregious form of violence that is contrary to the very concept of decent work . . . [and] harms the health, development and education of children and perpetuates the vicious cycle of poverty and deprivation," it is an inherently unsustainable practice. *See Goal 8: Promote Sustained, Inclusive and Sustainable Economic Growth, Full and Productive Employment and Decent Work for All*, UN Special Representative of the Sec'y-Gen. on Violence Against Children, https://violenceagainstchildren.un.org/sustainable-development-goals/goal-8 (last visited May 30, 2025).

3.     Cocoa farming is one such industry, with a well-publicized history of human trafficking, child slavery, environmental degradation, and other human rights violations.

4.     There is no doubt that child slavery and other abuses constituting the worst forms of child labor remain a serious and pervasive problem in Côte d'Ivoire and Ghana.[5] Children perform hazardous work in cocoa farming, including burning and clearing fields, cutting down trees to expand cocoa plantations, spraying pesticides, using sharp tools to break pods, and transporting heavy loads of cocoa pods and water. Plaintiff has directly observed and documented children performing these hazardous activities on numerous research trips to Côte d'Ivoire and Ghana from 1999[6] to the present, as illustrated in the photos below:



Child laborer, 12 years of age, uses a machete to harvest cocoa pods in Côte d'Ivoire.

---

[5] Bureau of Int'l Lab. Affs., Child Labor and Forced Labor Reports: Côte d'Ivoire (2021), https://www.dol.gov/agencies/ilab/resources/reports/child-labor/cote-divoire
[6] Plaintiff's Executive Director, Terrence Collingsworth, did early research on child slavery with IRAdvocates' predecessor organization, International Labor Rights Forum.



A representative of IRAdvocates speaks with child laborer, approximately 13 years of age, about the working conditions on a plantation in Côte d'Ivoire. The child explains that he is very hungry.



Child laborers approximately aged 9–14 gather on a cocoa plantation in Côte d'Ivoire.

5.      Nestlé is one of the largest food and beverage companies in the world. It sells a variety of chocolate, confectionery, and beverage products in which cocoa is a key ingredient. This complaint will refer to Nestlé's cocoa-containing products as "the Products."

6.      Nestlé describes itself as "The Good Food, Good Life Company."[7] Its self-ascribed purpose is to "unlock the power of food to enhance quality of life for everyone, today and for generations to come."[8] Nestlé claims that by "unlocking the power of food," it aims to "make the greatest difference to the lives of people and pets, protect and enhance the environment, and generate significant value for our shareholders and other stakeholders alike."[9]

7.      Despite its stated purposes, Nestlé's business practices demonstrate little regard for the lives of the children who produce the cocoa for its Products.

8.      Nestlé represents to the public that it does not tolerate illegal child labor and other human rights violations in its supply chains. These claims are false and misleading to consumers.

9.      Nestlé makes these representations through public advertisements and publicly available plans, reports, and internal codes.

10.      Nestlé's representations deceive consumers into believing that Nestlé is taking meaningful action to address and prevent child labor in its supply chain, while no such thing is occurring.

11.      Nestlé also perpetuates misleading claims about its sustainability and labor practices through seals and certifications that it prints on the packaging of some of its Products. Through these seals and certifications, Nestlé postures itself as a benevolent actor fighting against

---

[7] *About Us*, Nestlé, https://www.nestle.com/about (last visited May 30, 2025)
[8] *Id.*
[9] *Id.*

child labor. In reality, Nestlé continues to profit enormously from child labor while taking no meaningful action to rid the practice from its supply chain.

12.    Consumers who wish to purchase more ethical and sustainable alternatives rely on product packaging, marketing, advertising, and company reports to make informed decisions about what to purchase.

13.    Consumers seeking to buy ethically and sustainably sourced products are misled into believing that Nestlé is committed to and is making progress towards eradicating child labor from its supply chain.

14.    This is a consumer-protection case concerning Nestlé's deceptive claims about sources of the cocoa used in its Products. This case is brought by IRAdvocates, a nonprofit, public interest organization dedicated to holding corporations accountable for human rights abuses in the global supply chain and informing the public, including consumers, about the realities of these abuses.

15.    IRAdvocates alleges that Nestlé's advertising—which indicates that the company is committed to eradicating child labor from its supply chains and is making great progress in doing so—is false and misleading to District consumers.

## STATUTORY FRAMEWORK

16.    This action is brought under the District of Columbia Consumer Protection Procedures Act ("CPPA"), D.C. Code §§ 28-3901–3913.

17.    The CPPA makes it a violation for "any person" to, *inter alia*:

> Represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have;
>
> Represent that goods or services are of a particular standard, quality, grade, style or model, if in fact they are of another;

Misrepresent as to a material fact which has a tendency to mislead;

Fail to state a material fact if such failure tends to mislead;

Use innuendo or ambiguity as to a material fact, which has a tendency to mislead; or

Advertise or offer goods or services without the intent to sell them or without the intent to sell them as advertised or offered;

D.C. Code § 28-3904(a), (d), (e), (f), (f-1), (h).

18.     While the CPPA enumerates a number of specific unlawful trade practices, *see* D.C. Code § 28-3904, the enumeration is not exclusive. A main purpose of the CPPA is to "assure that a just mechanism exists to remedy all improper trade practices." D.C. Code § 28-3901(b)(1); *see also, e.g.*, *Dist. Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 722–23 (D.C. 2003); *Osbourne v. Capital City Mortg. Corp.*, 727 A.2d 322, 325–26 (D.C. 1999); *Atwater v. D.C. Dep't of Consumer & Reg. Affairs*, 566 A.2d 462, 465 (D.C. 1989).

19.     A violation may occur regardless of "whether or not any consumer is in fact misled, deceived, or damaged thereby." D.C. Code § 28-3904.

20.     The CPPA "establishes an enforceable right to truthful information from merchants about consumer goods and services that are or would be purchased, leased, or received in the District of Columbia." *Id.* § 28-3901(c). It "shall be construed and applied liberally to promote its purpose." *Id.*

21.     Under the statute, a "merchant" is defined as "a person, whether organized or operating for profit or for a nonprofit purpose, who in the ordinary course of business does or would sell, lease (to), or transfer, either directly or indirectly, consumer goods or services, or a person who in the ordinary course of business does or would supply the goods or services which are or would be the subject matter of a trade practice." *Id.* § 28-3901(a)(3).

22.     Nestlé is a "merchant" because it is a corporation that operates for profit by directly selling consumer goods and services to the public in Washington, D.C.

23.     Plaintiff in this case is a nonprofit, public-interest organization statutorily empowered pursuant to D.C. Code § 28-3905(k)(1)(D) to represent the interests of District of Columbia consumers.

24.     Per D.C. Code § 28-3905(k)(1)(D)(i), a public interest organization may act on behalf of the general public and bring any action that an individual consumer would be entitled to bring:

> [A] public interest organization may, on behalf of the interests of a consumer or a class of consumers, bring an action seeking relief from the use by any person of a trade practice in violation of a law of the District if the consumer or class could bring an action under subparagraph (A) of this paragraph for relief from such use by such person of such trade practice.

Subparagraph (A) provides: "A consumer may bring an action seeking relief from the use of a trade practice in violation of a law of the District," and pursuant to D.C. Code § 28-3901(c), placing false and misleading advertising into the D.C. marketplace is a trade practice in violation of the CPPA.

25.     A "public interest organization" under the CPPA is defined as "a nonprofit organization that is organized and operating, in whole or in part, for the purpose of promoting the interests or rights of consumers." *Id.* § 28-3901(a)(15).

26.     IRAdvocates is a 501(c)(3) nonprofit organization that is organized and operating for the purpose of advocating for human rights and transparency in corporate supply chains—an issue that matters deeply to many consumers. IRAdvocates' operations include combatting consumer fraud and educating consumers about the grim conditions under which many popular goods are sourced and produced. These educational efforts empower consumers to make informed

decisions about which products to buy and which companies to support. IRAdvocates thus is a public interest organization that may act on behalf of the general public and bring an action that an individual consumer would be entitled to bring. *See id.* §§ 28-3901(a)(15), -3905(k)(1)(D)(i).

27.    A public interest organization may act on behalf of the interests of consumers, i.e., the general public of the District of Columbia, so long as the organization has "sufficient nexus to the interests involved of the consumer or class to adequately represent those interests." *Id.* § 28-3905(k)(1)(D)(ii).

28.    IRAdvocates' work addresses a wide range of human rights issues through strategic ligation, research, policy advocacy, training, and coalition building. IRAdvocates represents consumers' interests by raising awareness of human rights violations that are commonplace in corporate supply chains. This work includes educating consumers in the District about such exploitative corporate practices. Additionally, since 1998, IRAdvocates has been working to expose child slavery and other abuses of children in cocoa harvesting. In particular, IRAdvocates has been conducting extensive research in Côte d'Ivoire and Ghana to expose that the child labor remediation programs Nestlé and other cocoa companies claim are helping to eradicate child labor are ineffective and designed to mislead consumers. IRAdvocates thus has a sufficient nexus to D.C. consumers' interests in knowing the truth about the source of their cocoa products and being able to make informed purchasing decisions in compliance with personal ethics.

29.    Accordingly, Plaintiff has standing to challenge Nestlé's misrepresentations about its Products in the District.

30.    This is not a class action, nor an action brought on behalf of any specific consumer. IRAdvocates brings this action on behalf of the general public, i.e., the interests of D.C. consumers generally. No class certification will be requested.

31.     This action does not seek damages. Instead, Plaintiff seeks to end the unlawful conduct directed at D.C. consumers. Remedies available under the CPPA include "[a]n injunction against the use of the unlawful trade practice," "[r]easonable attorney's fees," and "[a]ny other relief which the court determines proper." *Id.* § 28-3905(k)(2)(D), (B), (F). Plaintiff seeks injunctive relief enjoining Defendant from continuing to engage in the unlawful trade practices set forth in this Complaint. Plaintiff also seeks declaratory relief in the form of an order holding Nestlé's conduct to be unlawful in violation of the CPPA and requests its attorneys' fees and costs incurred in bringing this action.

## PARTIES

32.     Plaintiff IRAdvocates is a 501(c)(3) nonprofit organization based in Washington, D.C. that is dedicated to exposing human rights violations in global supply chains and seeking accountability from multinational companies responsible for those violations. IRAdvocates' promotes its mission by litigating cases, conducting research, and educating the general public, including consumers, about such abuses and the failures of multinational companies to live up to their promises relating to humane treatment of people in their supply chains. Often, as in this case, IRAdvocates' goal is to influence companies like Nestlé USA to honor and implement the "policies" and codes of conduct that they have already promised consumers they are applying.

33.     Defendant Nestlé USA, incorporated in Delaware and headquartered in Virginia, is one of the largest food and beverage companies in the United States, with more than 30,000 employees nationwide. It is one of the largest purchasers, manufacturers, and retail sellers of cocoa products in North America. Defendant advertises and sells the Products nationwide, including in the District.

10

## JURISDICTION AND VENUE

34.     This Court has personal jurisdiction over the Parties in this case. Plaintiff consents to this Court having personal jurisdiction over it.

35.     This Court has personal jurisdiction over Defendant pursuant to D.C. Code § 13-423. Defendant has sufficient minimum contacts with the District of Columbia to establish personal jurisdiction of this Court over it because Nestlé purposefully avails itself of the benefits and protections of District of Columbia law.

36.     Nestlé markets and sells its Products to consumers within the District. D.C. consumers who purchase the Products have access to Nestlé's representations about its Products through product packaging, the internet, and other forms of advertising. Nestlé's deceptive schemes and acts are directed at persons residing in, located in, or doing business in the District.

37.     This case arises out of Nestlé's representations made in the District of Columbia, to residents of the District, and with the intent that residents would act upon those representations and purchase the Products within the District. The beneficiaries of this action are D.C. consumers.

38.     This Court has subject-matter jurisdiction over this action pursuant to the CPPA, D.C. Code § 28-3901 *et seq.*

39.     Venue is proper in this Court because the events giving rise to this action take place in the District of Columbia. Defendant markets and sells its Products in the District. Its misleading representations are targeted at and accessible to D.C. consumers who purchase the Products in the District.

## BACKGROUND

40.     Nestlé sources approximately 60% of its cocoa from Côte d'Ivoire and Ghana,[10]

---

[10]     *Roll Out the Nestlé Cocoa Plan with Cocoa Farmers*, Nestlé, https://www.nestle-cwa.com/en/csv/communities/cocoa-plan (last visited May 30, 2025).

which are among the world's largest exporters of cocoa beans.[11] Together, the two countries produce about 60% of the world's cocoa.[12]

41.    According to the U.S. Department of Labor, children working in the Ivorian and Ghanian cocoa industries are subjected to the worst forms of child labor, as defined by International Labour Organization (ILO) Convention No. 182.[13] ILO Convention No. 182 defines the worst forms of child labor as, inter alia, "all forms of slavery or practices similar to slavery, such as the sale and trafficking of children, debt bondage and serfdom and forced or compulsory labour, including forced or compulsory recruitment of children for use in armed conflict" and "work which, by its nature or the circumstances in which it is carried out, is likely to harm the health, safety or morals of children."[14]

42.    Practices that are among the worst forms of child labor include forced child labor (work performed by children under threat or menace of penalty), burning and clearing fields, cutting down trees to expand cocoa plantations, spraying pesticides, using sharp tools such as machetes to cut down and open pods, and transporting heavy loads of cocoa pods and water.[15] These practices are endemic to the cocoa sectors in Côte d'Ivoire and Ghana.[16]

---

[11] *Cocoa Beans, Whole or Broken, Raw or Roasted Exports by Country in 2023*, World Integrated Trade Solution, https://wits.worldbank.org/trade/comtrade/en/country/ALL/year/2023/tradeflow/Exports/partner/WLD/product/180100 (last visited Apr. 30, 2025).

[12] *Id.*; U.S. Dep't of Lab., 2024 List of Goods Produced by Child Labor or Forced Labor 35 (2024), archived at https://web.archive.org/web/20241128121401/https://www.dol.gov/sites/dolgov/files/ilab/child_labor_reports/tda2023/2024-tvpra-list-of-goods.pdf.

[13] U.S. Dep't of Lab., Côte d'Ivoire: 2023 Findings on the Worst Forms of Child Labor 1 (2024), https://www.dol.gov/sites/dolgov/files/ILAB/child_labor_reports/tda2023/Cote-d%27Ivoire.pdf [hereinafter U.S. Dep't of Lab., Côte d'Ivoire 2023 Findings]; U.S. Dep't of Lab., Ghana: 2023 Findings on the Worst Forms of Child Labor 1 (2024); https://www.dol.gov/sites/dolgov/files/ILAB/child_labor_reports/tda2023/Ghana.pdf [hereinafter U.S. Dep't of Lab., Ghana 2023 Findings].

[14] Convention (No. 182) Concerning the Prohibition and Immediate Action for the Elimination of the Worst Forms of Child Labour, arts. 3(a), (d), June 17, 1999, T.I.A.S. No. 13045, 2133 U.N.T.S. 161.

[15] U.S. Dep't of Lab., Côte d'Ivoire 2023 Findings, *supra* note 13, at 1; U.S. Dep't of Lab., Ghana 2023 Findings, *supra* note 13, at 1; U.S. Dep't of Lab., *supra* note 12, at 52.

[16] U.S. Dep't of Lab., Côte d'Ivoire 2023 Findings, *supra* note 13, at 1; U.S. Dep't of Lab., Ghana 2023 Findings, *supra* note 13, at 1.

43.    The pervasiveness of child labor and forced child labor in West Africa has been subject to increasing scrutiny since the late 1990s. In 2001, the ILO released a report that confirmed the trafficking of children from neighboring countries to Côte d'Ivoire to work in the agricultural sector.[17] A 2002 U.S. Department of Labor-funded study estimated that more than 200,000 Ivorian children were performing hazardous work on cocoa farms, 100,000 of whom were younger than age 15.[18] The study also estimated that 38,700 Ghanaian children were involved in clearing fields with machetes, 18,000 of whom were younger than age 15.[19] Drawing on this study, the U.S. Department of State reported in 2004 that 5,000-to-10,000 children may have been trafficked to work in the Ivorian cocoa sector, and that there were approximately 109,000 child laborers in Côte d'Ivoire on cocoa farms engaged in the worst forms of child labor.[20]

44.    Further studies funded by the U.S. Department of Labor revealed child labor and the worst forms of child labor to be occurring on cocoa farms in Côte d'Ivoire and Ghana at a much greater magnitude.[21] The most recent data was collected in the 2018–19 growing season by the National Opinion Research Center (NORC) at the University of Chicago.

---

[17] Int'l Lab. Org., Combating Trafficking in Children for Labour Exploitation in West and Central Africa 10 tbl.2, 12 (2001), https://www.ilo.org/publications/combating-trafficking-children-labour-exploitation-west-and-central-africa.

[18] See Int'l Inst. of Tropical Agric., Child Labor in the Cocoa Sector of West Africa: A Synthesis of Findings in Cameroon, Côte d'Ivoire, Ghana, and Nigeria 15 tbl.4 (2002), https://www.cocoainitiative.org/knowledge-hub/resources/child-labor-cocoa-sector-west-africa.

[19] See id.

[20] U.S. Dep't of State, Country Reports on Human Rights Practices for 2004, at 176 (2005), https://www.state.gov/reports-bureau-of-democracy-human-rights-and-labor/country-reports-on-human-rights-practices/.

[21] See, e.g., Payson Ctr. for Int'l Dev., Tulane Univ. Sch. of Pub. Health, First Annual Report: Oversight of Public and Private Initiatives to Eliminate the Worst Forms of Child Labor in the Cocoa Sector in Côte d'Ivoire and Ghana (2007), https://www.dol.gov/sites/dolgov/files/ILAB/research_file_attachment/FINAL%20FIRST%20ANNUAL%20REPORT.pdf; Payson Ctr. for Int'l Dev., Tulane Univ. Sch. of Pub. Health, Second Annual Report: Oversight of Public and Private Initiatives to Eliminate the Worst Forms of Child Labor in the Cocoa Sector in Côte d'Ivoire and Ghana (2008), https://www.dol.gov/agencies/ilab/second-annual-report-oversight-public-and-private-initiatives-eliminate-worst-forms; Payson Ctr. for Int'l Dev., Tulane Univ. Sch. of Pub. Health, Third Annual Report: Oversight of Public and Private Initiatives to Eliminate the Worst Forms of Child Labor in the Cocoa Sector in Côte d'Ivoire and Ghana (2009), https://www.dol.gov/sites/dolgov/files/ILAB/research_file_attachment/Third%20Annual%20Report.pdf; Payson Ctr. for Int'l Dev., Tulane Univ. Sch. of Pub. Health, Final Report: Survey Research on Child Labor in West African Cocoa

45.    The NORC study concluded that 1.56 million child laborers were involved in cocoa production and harvesting in Côte d'Ivoire and Ghana during the 2018–19 growing season.[22] Of these 1.56 million children, 790,000 worked in Côte d'Ivoire and 770,000 worked in Ghana.[23] The World Cocoa Foundation, of which Nestlé is a member, has recognized the deeply troubling nature of these numbers.[24]

46.    NORC also found that about 1.48 million child laborers were engaged in hazardous labor in Côte d'Ivoire and Ghana during the 2018–19 growing season.[25] The most common types of hazardous labor included use of sharp tools (1.2 million children), carrying heavy loads (990,000 children), and agrochemical exposure (840,000 children).[26] Other forms of hazardous labor surveyed included land clearing (650,000 children), working at night (80,000 children), and working long hours (22,800 children).[27]

47.    Between the 2008–09 and 2018–19 growing seasons, the prevalence rate[28] of child labor in cocoa increased from 31% to 45%—14 percentage points.[29] The prevalence rate of hazardous child labor in cocoa increased from 30% to 43%—13 percentage points—in that same period.[30] Thus, the study concluded that "despite the efforts made by the governments, Industry,

---

Growing                                     Areas                                     (2015), https://www.dol.gov/sites/dolgov/files/ILAB/research_file_attachment/Tulane%20University%20-%20Survey%20Research%20Cocoa%20Sector%20-%2030%20July%202015.pdf.

[22] Nat'l Op. Rsch. Ctr., Assessing Progress in Reducing Child Labor in Cocoa Production in Cocoa Growing Areas of Côte d'Ivoire and Ghana 10 (2020), https://www.norc.org/content/dam/norc-org/pdfs/NORC%202020%20Cocoa%20Report_English.pdf.

[23] *Id.*

[24] *Empowering Communities*, World Cocoa Found. (Oct. 19, 2020), archived at https://worldcocoafoundation.org/.

[25] Nat'l Op. Rsch. Ctr., *supra* note 22, at 10.

[26] *Id.* at 48 tbl.6.

[27] *Id.*

[28] The prevalence rate is defined as the "proportion of children age 5-17 in child labor" who are involved "in cocoa production among agricultural households in cocoa growing areas of Côte d'Ivoire and Ghana." *Id.* at 12.

[29] *Id.*

[30] *Id.*

and other key stakeholders in combating child labor and hazardous child labor during the past 10 years, the child labor and hazardous child labor prevalence rates did not go down."[31]

48.    Additionally, the U.S. Department of Labor has described the harrowing conditions of human trafficking and forced child labor within the Ivorian cocoa industry:

> Some children are sold by their parents to traffickers, some are kidnapped, and others migrate willingly but fall victim to traffickers who sell them to recruiters or farmers, where they end up in conditions of bonded labor. Some farmers buy the children and refuse to let them leave the farm until the debt of their purchase has been worked off. The children are frequently not paid for their work; some of their wages are paid to the recruiter or trafficker. These children are held against their will on isolated farms, are locked in their living quarters at night, and are threatened and beaten if they attempt to escape. They are punished by their employers with physical abuse. They are forced to work long hours, including overtime, and are required to work even when they are sick. Some children are denied sufficient food by their traffickers and employers. Some children are forced to perform dangerous tasks, including carrying heavy loads, using machetes and sharp tools, and applying pesticides and fertilizers.[32]

49.    Although the problem of child labor in the cocoa industry only seems to be getting worse as time goes on, the world's major chocolate companies, including Nestlé, have actually been promising to fix the problem for more than two decades.

50.    In 1999, labor rights and consumer groups urged Congress to make companies stop using child labor and to pay the adult workers a living wage. Congressman Bernie Sanders and Congressman Elliot Engel introduced legislation that would ban the importation of cocoa harvested by child labor. This bill was passed by the House and was awaiting a vote in the Senate.

---

[31] *Id.*

[32] *List of Goods Produced by Child Labor or Forced Labor*, Bur. of Int'l Lab. Affs., U.S. Dep't of Lab., https://www.dol.gov/agencies/ilab/reports/child-labor/list-of-goods#:~:text=The%20most%20common%20agricultural%20goods,and%20diamonds%20are%20most%20common. (last visited May 30, 2025).

51.     Facing mandatory consequences for use of child labor, the cocoa industry staunchly opposed and intensely lobbied against this bill. The lobbying worked, and in 2001, Senator Tom Harkin and Congressman Eliot Engel established the Harkin-Engel Protocol.

52.     The 2001 Harkin-Engel Protocol was a "voluntary" initiative that gave companies who signed it, including Nestlé, until 2005 to "phase out" the worst forms of child labor in their supply chains in Côte d'Ivoire and Ghana. This protocol was aimed at eliminating the worst forms of child labor in the cocoa sector.

53.     But over the years, the signatories of the Harkin-Engel Protocol, including Nestlé, failed to make meaningful changes and continued to extend their deadlines and change the scope of their goals—all while continuing publicly to pay lip service to the cause. This Complaint describes how Nestlé continues to mislead the public by falsely representing that it is (1) committed to ending child labor in its supply chains, and (2) taking meaningful and effective action to solve the problem. In reality, Nestlé continues to profit immensely off of the child labor in its supply chain and refuses to take the necessary action to truly rid its cocoa supply of this scourge.

## FACT ALLEGATIONS

I.    **Nestlé Represents to Consumers That It Is Committed to and Making Progress in Eradicating Child Labor from Its Supply Chain.**

54.     There is no shortage of statements and reports propagated by Nestlé that emphasize the company's purported commitment to eliminating child labor from its supply chain.

A.    **Nestlé Advertises Official Policies and Standards.**

55.     According to the *Nestlé Responsible Sourcing Core Requirements*, effective as of January 2024, Nestlé requires all actors in its supply chain to ensure that "[n]o child aged 15 or below is employed," that "[c]hildren aged 13 or over . . . can perform only light work where this is permitted by local law," and that "[n]o child . . . carries out hazardous work or other worst forms

of child labor."[33] Furthermore, there must be processes in place to "verify the effective age of workers" and "remedy any identified cases of child labor."[34]

56.     Nestlé also requires actors in its supply chain to have a policy in place that "stipulates the minimum age for all workers, the conditions under which young workers can be employed and the remediation process to follow in the event that a child labor case is identified," and to train "relevant functions and employees" on child labor prevention and mitigation.[35] Nestlé exempts "small farms" and "smallholder farms" from these two requirements.[36]

57.     In Nestlé's *Corporate Business Principles*, effective as of July 2020, Nestlé claims to "respect and promote human rights in our operations and entire value chain, in line with the United Nations Guiding Principles and the Ten Principles of the UN Global Compact."[37] Nestlé also affirms its commitment to complying with other widely accepted international human rights standards, including the International Bill of Human Rights, the ILO's Declaration on the Fundamental Principles and Rights at Work, the ILO's Tripartite Declaration of Principles concerning Multinational Enterprises and Social Policy (ILO), and the Organization for Economic Cooperation and Development (OECD) Guidelines for Multinational Enterprises.[38]

58.     Nestlé asserts that it takes concrete action to ensure compliance with these international standards:

> We take steps to identify and address any actual or potential adverse impacts arising directly or indirectly through our own activities or our business relationships. We manage these risks by integrating controls into our

---

[33]    Nestlé, Nestlé Responsible Sourcing Core Requirements 6, 11 (2024), https://www.nestle.com/sites/default/files/asset-library/documents/library/documents/suppliers/nestle-responsible-sourcing-standard-english.pdf.
[34]    *Id.*
[35]    *Id.*
[36]    *Id.*
[37]    Nestlé, Corporate Business Principles 4 (2020), https://www.nestle.com/sites/default/files/asset-library/documents/library/documents/corporate_governance/corporate-business-principles-en.pdf.
[38]    *Id.*

policies and internal systems, acting on the findings, tracking our actions, and communicating with our stakeholders about how we address impacts.[39]

59.     The *Corporate Business Principles* recognize that a commitment to upholding human rights requires a commitment to eradicating child labor. Nestlé states that it "take[s] action against any violations of human rights in our operations and value chain, with zero tolerance to child labor, forced labor and modern slavery."[40]

60.     In *Nestlé's Human Rights Framework and Roadmap*, the company describes its efforts towards "[s]upporting a just transition toward a regenerative food system."[41] Nestlé recognizes that "[c]hild labor is work that is mentally, physically, socially or morally dangerous and harmful to children or interferes with their education by depriving them of the opportunity to attend school."[42] Nestlé claims that "[c]ompanies like ours play an important role to address risks and improve access to education, especially in communities where poverty is widespread and resources are scarce."[43] Accordingly, Nestlé claims that through its Child Labor Monitoring & Remediation Systems ("CLMRS"), the company "act[s] as soon as children at risk are detected. For the cases where we can intervene, we try to understand the root cause and then work with the family and/or the community to develop a tailored solution."[44]

61.     Nestlé makes all of these statements easily accessible to consumers on its website.

**B.      Nestlé Advertises a "Nestlé Cocoa Plan."**

62.     In 2009, Nestlé announced it would be moving towards sustainability in cocoa production with the Nestlé Cocoa Plan. As part of this plan, Nestlé claimed it would work towards

---

[39] *Id.*
[40] *Id.*
[41] Nestlé, Nestlé's Human Rights Framework and Roadmap 1 (2021), https://www.nestle.com/sites/default/files/2021-12/nestle-human-rights-framework-roadmap.pdf.
[42] *Id.* at 14.
[43] *Id.* at 15.
[44] *Id.*

"better social conditions" and work with the International Cocoa Initiative and the World Cocoa Foundation to tackle child labor.[45]

63.     Nestlé claimed that these actions would be taken under the guiding principle of "Creating Shared Value" (CSV).[46] According to Nestlé, CSV consists of "creating value for shareholders and society in a manner that is integrally linked to its core business strategies and operations."[47] This value would be "created for shareholders, employees, farmers, consumers and the communities where we operate."[48]

64.     The Nestlé Cocoa Plan is said to rest on three pillars: "Better farming, aiming to improve livelihoods in communities. Better lives, aiming to improve social conditions for families. And Better cocoa, aiming to improve product sustainability."[49]

65.     Nestlé's annual CSV reports have repeatedly echoed the same sentiments regarding the Nestlé Cocoa Plan: that it is working to eliminate child labor by (1) setting up CLMRS, (2) improving farmer incomes and profitability, (3) supporting children's education, and (4) utilizing third-party certification systems such as UTZ certified, Rainforest Alliance, and Fairtrade. The reports also emphasize that Nestlé complies with international human rights and labor standards, that it complies with the UNGPs, and that it is cooperating with West African governments in working towards eradication of child labor in its cocoa supply.[50]

---

[45] Nestlé, Nestlé and Sustainable Cocoa: 'The Cocoa Plan' 2 (2009), https://www.nestlecocoaplan.com/our-approach/nestle-cocoa-plan.

[46] *Id.* at 1.

[47] *Id.*

[48] *Id.*

[49] *Our Vision for a Brighter Future*, Nestlé Cocoa Plan, https://www.nestlecocoaplan.com/our-approach/nestle-cocoa-plan (last visited May 30, 2025).

[50] *See, e.g.*, Nestlé, The Nestlé Creating Shared Value Report 22, 32–33, 35, 52 (2008).

66.     In its 2019 Tackling Child Labor Report, Nestlé announced that it was moving "Towards 100% sustainable cocoa" with the promise that by 2025 "100% of the cocoa used in our confectionery products will be sourced through the Nestlé Cocoa Plan."[51]

67.     In its 2019 Nestlé Cocoa Plan Progress Report, Nestlé claimed that it sourced 44% of its cocoa through the Nestlé Cocoa Plan that year.[52] As of 2024, Nestlé claims to source 89.9% of its cocoa through the Nestlé Cocoa Plan.[53]

68.     Also as of 2024, Nestlé claims there are 123,953 cocoa-farming households covered by CLMRS and that 96,580 children have received prevention and remediation support through CLMRS.[54]

69.     On its website's FAQ page, Nestlé responds to consumer concerns regarding the child labor risks in its supply chain.[55] In response to the question, "What is Nestlé doing to prevent child labor risk?"[56] Nestlé cites the Nestlé Cocoa Plan, promising that all of its cocoa will be sourced through this "sustainability program" by 2025.[57]

70.     Recognizing that "in West Africa, most child labor involves children supporting their parents on farms," Nestlé claims to "prioritize family and community engagement as well as helping farm families reach a living income" and that it "remain[s] dedicated to helping end child labor in the cocoa industry."[58]

---

[51] Nestlé, Tackling Child Labor: 2019 Report 76 (2019), https://www.nestle.com/sites/default/files/2019-12/nestle-tackling-child-labor-report-2019-en.pdf.

[52] Nestlé, Nestlé Cocoa Plan Progress Report 2019, at 20 (2019), https://www.nestle.com/sites/default/files/2020-06/nestle-cocoa-plan-progress-report-2019.pdf.

[53] Nestlé, Creating Shared Value at Nestlé 2024, at 38 (2025), https://www.nestle.com/sites/default/files/2025-02/creating-shared-value-nestle-2024.pdf.

[54] *Id.*

[55] *Ask Nestlé*, Nestlé, https://www.nestle.com/ask-nestle (last visited May 30, 2025).

[56] *Id.*

[57] *How Is Nestlé Tackling Child Labor Risk?*, Nestlé, https://www.nestle.com/ask-nestle/human-rights/answers/nestle-child-labour-supply-chains (last visited May. 30, 2025).

[58] *Id.*

71.    Recognizing that "in communities with good quality schooling, child labor is lower," Nestlé claims that it is "[p]roviding access to education," including by "offer[ing] access to bridging classes for kids who have been out of school and need to catch up, as well as working directly in communities to secure school kits and birth certificates."[59]

72.    Recognizing that poverty is a root cause of child labor, Nestlé claims it is "[o]vercoming poverty by promoting a stable economy and a healthy society."[60] Nestlé claims that it "strongly believe[s] that farmers should earn an income that allows them and their families to live a decent life," and that it "support[s] farmers and farming communities to improve their income and livelihoods, helping them to reach a living income."[61]

73.    Nestlé also claims that "[a]s soon as child labor risks are detected across any of the thousands of households covered by the Child Labor Monitoring and Remediation System . . . we take action, working directly with families and communities to understand the root cause and develop tailored solutions."[62]

74.    In response to the question, "Does Nestlé support a living income for cocoa farmers?",[63] Nestlé claims, "[w]e believe cocoa farmers should earn an income that allows them to maintain a decent and adequate standard of living for them and their families."[64] Nestlé further states:

> We have been paying the Living Income Differential (LID) - a premium on cocoa - since its inception in Côte d'Ivoire and Ghana. We also support the Côte d'Ivoire-Ghana Cocoa Initiative (CIGCI) to help identify long-term solutions that help cocoa farmers achieve and sustain a living income, and

---

[59] *Id.*
[60] *Id.*
[61] *Id.*
[62] *Id.*
[63] *Ask Nestlé, supra* note 55.
[64] *Does Nestlé Support a Living Income for Cocoa Farmers?*, Nestlé, https://www.nestle.com/ask-nestle/human-rights/answers/support-living-income-cocoa-farmers (last visited May 30, 2025).

welcome recent developments to find a workable path forward for farmers and commodity users alike.[65]

75.    Additionally, Nestlé cites its Income Accelerator Program, which launched in 2022.[66] The Income Accelerator Program claims to tackle the issue of insufficient income, which Nestlé states is a "leading factor in the prevalence of child labor risks."[67] Nestlé further states that the program is "building on [Nestlé's] longstanding efforts to tackle child labor risks in cocoa production."[68] This program gives cash incentives to families for school enrollment of children in the household, agricultural practices that boost cocoa production, agroforestry activities, and diversification of incomes.[69]

76.    All of the aforementioned representations paint a clear picture for the consumer: that Nestlé as a company has no tolerance for child labor in its supply chains and thus is sparing no effort to get to the root causes of child labor in its supply chain. But, as discussed *infra* Part III, this rosy picture is plainly false.

## II.    Nestlé's Product Packaging Represents to Consumers That Its Products are Responsibly and Sustainably Sourced.

77.    Nestlé advertises its Cocoa Plan and sustainability initiatives through labels on its packaging. Through slogans such as "Responsibly sourced cocoa" and "Better Farming, Better Lives, Better Cocoa," as well as third-party certification seals, these labels communicate to consumers not only that the product therein has been produced ethically and sustainably, but also that Nestlé as a company is committed meaningfully to improving the conditions under which its cocoa is produced.

---

[65] *Id.*
[66] *Id.*
[67] Nestlé, The Income Accelerator Program: How It Works 1 (2022), https://www.nestle.com/sites/default/files/2023-07/nestle-income-accelerator-program.pdf.
[68] *Id.*
[69] *Id.* at 2.

78.    The labels emphasize that making the purchase will support the farmers who grew the product: "Nestlé Cocoa Plan is supporting farmers for better chocolate. Nestlé and the Rainforest Alliance work together to help improve the lives of cocoa farmers and optimize the quality of their product."

79.    The labels encourage consumers to visit nestlecocoaplan.com, where they can learn about Nestlé's "commitment to sustainably sourced cocoa and making a positive social impact in cocoa communities" and access Nestlé's progress reports on the Cocoa Plan, along with other reports on Nestle's child labor and the income-boosting initiatives.[70] The labels with Rainforest Alliance seals also direct consumers to visit ra.org, where they will learn that the frog represents "a world-renowned standard for sustainability," and that "[f]arms earn this certification by meeting our rigorous criteria for practices that benefit both people and the planet. Certified farms nourish the land, use fewer pesticides, fight climate change, treat workers fairly, while meeting a range of other requirements expertly designed to create a better world."[71]

80.    Below are several examples of labeling that is found on Products sold in the District of Columbia:

---

[70] Nestlé Cocoa Plan, https://www.nestlecocoaplan.com/ (last visited May, 30, 2025).
[71] Rainforest Alliance, https://www.rainforest-alliance.org/ (last visited May 30, 2025).













  

 

  

 

III.    **Nestlé's Representations Regarding Its Commitments and Actions with Respect to Child Labor and the Responsible Sourcing of Its Products Are False and Misleading to Consumers.**

A.    **An IRAdvocates Investigation Reveals That Nestlé Fraudulently Undermines Farmer Incomes While Faking Rehabilitation of Child Laborers.**

81.    In the fall of 2023 and in February 2025, IRAdvocates conducted investigation in Ghana in collaboration with a whistleblower[72] who worked for Touton S.A., one of Nestlé's buying agents on the ground. The investigation revealed that child labor is prevalent on numerous plantations that source directly to Nestlé, and in fact, that the laborers on each investigated farm consist mostly of children.

82.    The IRAdvocates Investigation discovered that these children were working with dangerous chemicals and machetes, work that ILO Convention No. 182 prohibits children from performing, as these activities are considered the "Worst Forms of Child Labor."

83.    Every plantation that IRAdvocates visited used child labor as the majority of its workforce, which indicates that Nestlé's CLMRS regimes are not enforced. Nestlé claims that its CLMRS, in some way, includes direct communication with farmers, regular monitoring, and support for farmers to create income-producing activities; but none of the farmers interviewed for the IRAdvocates Investigation that source to Nestlé had ever heard of CLMRS or met any sort of monitoring crew.

---

[72] The IRAdvocates Investigation benefited from the insight of one whistleblower, who has witnessed this child labor firsthand and whose name has been withheld for safety and security reasons.

84.    Virtually all of the children told the investigators that they had been working on the farms for years and are not able to attend school due to their families' poverty. IRAdvocates' interviews with the parents of the child workers confirmed that the fundamental problem was that the major chocolate companies, including Nestlé, paid so little for harvested cocoa that the families remained impoverished despite working extremely hard under hazardous conditions.

85.    Additionally, the investigation revealed that Touton, Ecom Ghana, and Cargill, all of which purchase cocoa on behalf of Nestlé, systematically use rigged scales to weigh the farmers' cocoa. The investigators confirmed that the scales underweighted the cocoa by 7 kilos. The buying agents then take an additional 2 kilos off, claiming that the weight changes as cocoa dries, which is false.

86.    As a result, Nestlé pays only for 62 kilos of cocoa per bag, despite each bag actually weighing 71 kilos.

87.    The whistleblower, in his capacity as a Touton official, has direct knowledge of this deceptive underpayment scheme and confirmed that it is a standard practice employed by buying agents acting on behalf of Nestlé and other major companies in Ghana.

88.    Ghana sets a minimum price for cocoa through its government-regulated system to protect farmers from market volatility and exploitative pricing by large buyers. The Ghana Cocoa Board ("COCOBOD"), a government agency, determines the Guaranteed Minimum Producer Price annually, ensuring that farmers receive a fair and stable income regardless of fluctuations in global cocoa prices.

89.    At nine kilos deducted per bag, Nestlé fails to meet Ghana's Guaranteed Minimum Producer Price as set by COCOBOD, effectively exploiting the plantations and farmers. This

systematic underpayment ensures that cocoa farmers and plantations remain trapped in poverty, making them reliant on child labor to meet production demands and sustain their livelihoods.

90.     IRAdvocates was told this is standard practice. This discovery shows that Nestlé is not only failing to follow through on promises to address low incomes and poverty, root causes of child labor, but upon information and belief is intentionally, as a matter of practice, cheating the farmers it claims to be helping.

91.     The investigation also revealed that Nestlé's work to rehabilitate children by providing educational support is a sham. While Nestlé claims to remove child laborers from the farm by giving them school kits and monitoring them to ensure the remediation was successful, the investigation revealed that the very children who Nestlé claimed to have remediated via documented lists were simply photographed with a school bag and exercise book, then returned to the farm and never visited again.

92.     The investigation found instances of children whom Nestlé documented as being remediated, yet these children were never contacted at all, nor did they receive a school bag or kit.

93.     The investigation also uncovered that many names on Nestlé's list of remediated children were fabricated. The whistleblower himself stated that he and his colleagues as a matter of practice fabricated rehabilitation lists because the cocoa companies demanded big numbers but never even attempted to verify the lists were legitimate. The whistleblower personally verified that a colleague working for Ecom Ghana, the agent Nestlé uses to manage its rehabilitation programs, fabricated names for Nestlé and the company never sought to verify any of the names on the list. This not only shows the specific examples of deceptive claims by Nestlé regarding its rehabilitation programs—it is direct evidence that the entire scheme is simply in place to mislead the public for profit.

94.     The investigation uncovered gross misconduct that a reasonable consumer would not expect from a company that "respect[s] and promote[s] human rights in [its] operations and entire value chain."[73]

95.     A reasonable consumer would not expect a company that recognizes its own "important role" in "address[ing] [child labor] risks and improv[ing] access to education, especially in communities where poverty is widespread and resource are scarce" to turn an opportunity for remediation into a superficial photo op that made no difference to the children, who continued to work on the farm with no follow up.[74] A reasonable consumer would not expect Nestlé's CLMRS interventions to be this ineffectual.

96.     Paying so little for cocoa that farmers cannot afford to send their children to school, deceptively withholding payment for cocoa received, and fabricating lists of remediated children are not things that a reasonable consumer would regard as "creating value" for "farmers . . . and the communities where [Nestlé] operate[s]".[75]

97.     A reasonable consumer would not regard such conduct as "prioritiz[ing] family and community engagement," "helping farm families reach a living income," or demonstrating "dedicat[ion] to helping end child labor in the cocoa industry."[76]

98.     When Nestlé reports that it has provided a certain number of school kits to help remediate child laborers, a reasonable consumer would not expect that Nestlé has allowed fabricated lists to be the basis for its specific claims to the public about its work in rehabilitating former child laborers.

---

[73] *See* Nestlé, Corporate Business Principles 4 (2020), https://www.nestle.com/sites/default/files/asset-library/documents/library/documents/corporate_governance/corporate-business-principles-en.pdf.
[74] *See* Nestlé, Nestlé's Human Rights Framework and Roadmap 15 (2021), https://www.nestle.com/sites/default/files/2021-12/nestle-human-rights-framework-roadmap.pdf.
[75] *See* Nestlé, Nestlé and Sustainable Cocoa: 'The Cocoa Plan' 1 (2009), https://www.nestlecocoaplan.com/.
[76] *How Is Nestlé Tackling Child Labor Risk?*, Nestlé, https://www.nestle.com/ask-nestle/human-rights/answers/nestle-child-labour-supply-chains (last visited May 30, 2025).

99.    Systematically cheating cocoa farmers out of money owed to them does not help address the "root cause" of child labor by "overcoming poverty," nor does it "promot[e] a stable economy and a healthy society."[77] A company that "strongly believe[s] that farmers should earn an income that allows them and their families to live a decent life" would not engage in such conduct.[78]

**B.    The Nestlé Cocoa Plan Is Ineffective Because, Contrary to Nestlé's Promises, It Fails to Address the Root Cause of Child Labor.[79]**

100.    The data that Nestlé reports on its Cocoa Plan appear unreliable, and not only because of the fabricated remediation lists that the IRAdvocates Investigation uncovered.

101.    In March 2019, through interviews with the World Cocoa Foundation, International Cocoa Initiative, and Fair Labor Association (FLA), Plaintiff's counsel learned that, at most, 20–30% of any major chocolate company's cocoa from West Africa, including the Defendant's, is sourced from plantations that are in cooperatives and are participants in programs that supposedly allow for monitoring and traceability, like the Nestlé Cocoa Plan. The remaining 70–80% comes from the "free zones"—cocoa-growing areas of Côte d'Ivoire and Ghana where there is no monitoring at all and a high incidence of child labor, including trafficked child labor.

102.    In the 2019 Nestlé Cocoa Plan Progress Report, however, Nestlé claimed that it sourced 44% of its cocoa—183,361 tons—through the Nestlé Cocoa Plan.[80] This indicates that Nestlé purchased approximately 416,730 tons of cocoa globally in 2019. Since Nestlé sources

---

[77] *Id.*

[78] *Id.*

[79] Investigations and audits in these sections that predate the statute of limitations for a CPPA claim are nonetheless relevant here, because Nestlé makes ongoing misrepresentations to D.C. consumers characterizing its purported efforts to combat child labor over the past ten years or more.

[80]    Nestlé,    Nestlé    Cocoa    Plan    Progress    Report    2019,    at    20    (2019), https://www.nestle.com/sites/default/files/2020-06/nestle-cocoa-plan-progress-report-2019.pdf.

approximately 60% of its cocoa from West Africa,[81] this suggests that it sourced about 250,000 tons of cocoa from the region in 2019. Nestlé claims that it sourced 133,035 tons from Côte D'Ivoire and 15,000 tons from Ghana in 2019.[82] If true, this would mean that 60% of its West African cocoa was sourced through the Nestlé Cocoa Plan in 2019. This simply is not possible.

103.    But the ineffectiveness of the Nestlé Cocoa Plan is not the result only of fake rehabilitation lists and unreliable data.

104.    A series of independent audits in 2014–2017 by the Fair Labor Association (FLA) have revealed that the worst forms of child labor continue to take place on the farms that are subject to Nestlé's CLMRS. In the 2014 audit, the FLA conducted random and unannounced audits on farms participating in the Nestlé Cocoa Plan.[83] The FLA identified 3% of the workforce it interviewed as being under age 15, and another 3% as being ages 15–18.[84] The FLA found that child workers were not attending school and instead were carrying out hazardous tasks that involved using machetes and bearing heavy loads.[85] The FLA also found an instance of forced labor, "where a young worker was limited in his freedom to use his wages at his own discretion" and "although the young worker ha[d] been working for almost two years for the farmer, his salary for the first year was still not paid at the time of the visit."[86]

105.    The FLA audits conducted in 2015, 2016, and 2017 would each again find hazardous child labor taking place on farms participating in the Nestlé Cocoa Plan's CLMRS. In 2015, the auditors observed that some of these children were family workers who couldn't attend

---

[81] *Roll Out the Nestlé Cocoa Plan with Cocoa Farmers*, Nestlé, https://www.nestle-cwa.com/en/csv/communities/cocoa-plan (last visited May 30, 2025).

[82] Nestlé, Nestlé Cocoa Plan Progress Report 2019, at 4 (2019), https://www.nestlecocoaplan.com/sites/default/files/2023-08/nestle-cocoa-plan-annual-report-final_8.pdf.

[83] Fair Lab. Ass'n, Independent External Monitoring of Nestlé's Cocoa Supply Chain in Ivory Coast: 2014–2015, at 1 (2015) https://www.fairlabor.org/reports/2014-executive-summary-nestle-cocoa-supply-chain-ivory-coast/.

[84] *Id.* at 4.

[85] *Id.*

[86] *Id.* at 3–4.

school for financial reasons, while others were children not in the family who were hired to work.[87] In the 2016 audit, the FLA observed a 13-year-old girl using an axe and a 9-year-old boy who was exposed to herbicide without any personal protection.[88] And in 2017, the auditors found that incidences of dangerous child labor seemed to be increasing.[89]

106.    Nestlé's CLRMS are clearly flawed in execution. Even if they were not, experts indicate that even the most well-executed CLMRS would only detect 60% of child labor cases and stop 30% of child laborers from continuing to carry out hazardous work.[90] Actually to be effective, the Nestlé Cocoa Plan would have to address the root cause of child labor—which it claims to do.

107.    As Nestlé has long recognized, the main root cause of child labor is poverty. Cocoa-farming families are forced to put their children to work for no pay because otherwise they would starve. Children will not be permanently rehabilitated and able to attend school until farmers are paid a living wage. Despite knowing this for well over a decade, Nestlé refuses to pay a fair price for cocoa. And the fraudulent tactics revealed during the IRAdvocates investigation are not the only way that Nestlé has evaded paying a fair price.

108.    Nestlé claims that it supports the Living Income Differential (LID) in Côte d'Ivoire and Ghana. What Nestlé doesn't tell consumers is that the Living Income Differential does not actually guarantee a living income to farmers. In fact, the policy has mostly failed in both countries because major chocolate companies used their market power to undermine it:

> Sales of Ivorian and Ghanaian cocoa were very low at the beginning of 2021,
> and again in 2022. However, . . . CCC and COCOBOD need to forward sell

---

[87] Fair Lab. Ass'n, Independent External Monitoring of Nestlé's Cocoa Supply Chain in Ivory Coast: 2015, at 5 (2016) https://www.fairlabor.org/reports/2015-executive-summary-nestle-cocoa-supply-chain-cote-divoire/.

[88] Fair Lab. Ass'n, 2016 Independent External Monitoring Agricultural Report: Gagnoa 7, 8 (2017), https://www.fairlabor.org/reports/2016-independent-external-monitoring-reports-nestle-cocoa-supply-chain-cote-divoire/.

[89] Fair Lab. Ass'n, Independent External Monitoring OF Nestlé's Cocoa Supply Chain In Côte d'Ivoire: 2017, at 6 (2021), https://www.fairlabor.org/reports/2017-executive-summary-nestle-cocoa-supply-chain-cote-divoire/.

[90] Antonie C. Fountain & Friedel Huetz-Adams, *Cocoa Barometer 2022*, at 60 (2022), https://voicenetwork.cc/wp-content/uploads/2022/12/Cocoa-Barometer-2022.pdf.

their cocoa to fix a minimum price at the beginning of the season. Some companies waited until CCC and COCOBOD were desperate, stepping in very late and offering to buy large volumes of cocoa with the condition of a significant discount on the country differential, which is another premium usually added to the stock market price. When the LID was introduced, this country differential turned negative. Income from cocoa was therefore not increased by US$ 400 per tonne but by much less—if at all.[91]

These market dynamics forced Côte d'Ivoire to lower its minimum farmgate price midseason—resulting in farmers fetching even lower prices for their cocoa.[92]

109.    Thus, Nestlé's "commitment" to paying the LID does little to improve the economic circumstances of its farmers.

110.    The Income Accelerator Program is yet another endeavor that allows Nestlé to sidestep paying a fair price for cocoa while representing to consumers that it is making a difference in improving farmer livelihood and reducing child labor risks. The maximum payment a family can receive in a year is $500 CHF for the first two years.[93] After that, the maximum yearly payment is $250 CHF.[94] The 2022 living wage in Côte d'Ivoire was $6,365 CHF.[95] Needless to say, neither $250 nor $500 comes close to securing a living wage.

111.    Furthermore, even receiving these maximum amounts is conditional. While there is one $100 CHF bonus for school enrollment of children, three other $100 bonuses will be granted for good agricultural practices, agroforestry activities, and diversifying income by growing other crops or raising livestock, respectively.[96] The final $100 bonus will be granted if all four conditions are met.[97]

---

[91]    Antonie C. Fountain & Friedel Huetz-Adams, Cocoa Barometer 2022, at 28 (2022), https://voicenetwork.cc/wp-content/uploads/2022/12/Cocoa-Barometer-2022.pdf.

[92]    *Id.* at 28–29.

[93]    Nestlé, The Income Accelerator Program: How It Works 2 (2022), https://www.nestlecocoaplan.com/our-approach/income-accelerator-program.

[94]    *Id.*

[95]    *Id.*

[96]    *Id.*

[97]    *Id.*

112.    Studies have shown that pushing increased productivity does not actually improve the livelihoods of farmers because of the increased labor and input costs.[98] In fact, it can encourage families to use child labor, because that may be the only way they can achieve the desired productivity levels.[99]

113.    While incentivizing school enrollment in theory should reduce child labor risks, by tying $400 out of $500 to productivity targets that require **_more_** labor, Nestlé is actually increasing the risk that families will resort to child labor.

114.    By hyperfocusing on productivity, the Income Accelerator Program does not effectively address the "root causes" of child labor.[100]

115.    Nestlé claims that it is moving "[t]owards 100% sustainable cocoa" with the promise that by 2025 "100% of the cocoa used in our confectionery products will be sourced through the Nestlé Cocoa Plan."[101] But even if Nestlé manages to secure 100% of its cocoa through the Cocoa Plan, the cocoa will still not be sustainable, let alone 100% sustainable. Nestlé's CLMRS system cannot guarantee that there is no child labor, and Nestlé does not even seem to be reducing the risk of child labor to begin with.

116.    Even if Nestlé fixes its CLMRS, it still needs to address the root cause of child labor in its supply chains: poverty. A reasonable consumer would expect that the Income Accelerator Program is helping farmers to make a living wage, since that's what Nestlé claims it does.[102] A

---

[98]    Antonie C. Fountain & Friedel Huetz-Adams, Cocoa Barometer 2022, at 14 (2022), https://voicenetwork.cc/wp-content/uploads/2022/12/Cocoa-Barometer-2022.pdf.
[99]    _Id._
[100]    _See_ Nestlé, The Income Accelerator Program: How It Works 1 (2022), https://www.nestlecocoaplan.com/our-approach/income-accelerator-program.
[101]    Nestlé, Tackling Child Labor: 2019 Report 76 (2019), https://www.nestle.com/sites/default/files/2019-12/nestle-tackling-child-labor-report-2019-en.pdf.
[102]    _Does Nestlé Support a Living Income for Cocoa Farmers_?, Nestlé, https://www.nestle.com/ask-nestle/human-rights/answers/support-living-income-cocoa-farmers (last visited May 30, 2025).

reasonable consumer would not expect the program to be effectively entrenching the status quo by allowing Nestlé to avoid paying a fair farmgate price.

117.    When a D.C. consumer sees the Nestlé Cocoa Plan logo next to phrases such as "Responsibly sourced cocoa," "Better Farming, Better Lives, Better Cocoa," "sustainably-sourced cocoa," and "Nestlé and Rainforest Alliance work together to help improve the lives of cocoa farmers," the consumer would reasonably believe that no child labor was involved in the making of the product and that the farmers behind it were compensated fairly. At the very least, a reasonable consumer would believe that the Nestlé Cocoa Plan is actually able meaningfully to reduce the risk of child labor in Nestlé's supply chains, in light of the claims on the product packaging and on Nestlé's website, which the package directs the consumer to. The Nestlé Cocoa Plan, in reality, does not comport with either of those beliefs.

### C.    Nestlé's Rainforest Alliance Certification Seals Do Not Guarantee Responsibly or Sustainably Sourced Cocoa.

118.    In addition to the Nestlé Cocoa Plan, Nestlé uses the third-party certification with Rainforest Alliance to assure consumers of the sustainability of its Products. Previously, Nestlé utilized UTZ certification, which merged with Rainforest Alliance in 2018.

119.    Nestlé claims that these certifications mean that its cocoa is "responsibly sourced" "sustainably sourced," and "help[ing] improve the lives of cocoa farmers."

120.    Despite its representations, Nestlé's Rainforest Alliance and previous UTZ certifications do not indicate that the cocoa is responsibly or sustainably sourced. Sourcing that utilizes child labor is neither responsible nor sustainable.

121.    UTZ certification has been found to be ineffective with respect to preventing child labor on cocoa farms. A 2018 study sponsored by Nestlé and UTZ demonstrated that there was actually more child labor occurring on UTZ farms than on non-UTZ farms.[103]

122.    Rainforest Alliance certification is also ineffective at preventing child labor. Only about 10% of Rainforest Alliance farms are actually evaluated for child labor each year.[104] Audits are announced ahead of time, which allows farms to temporarily cease using child labor for the duration of the audit.[105]

123.    Independent investigations by the NGO Corporate Accountability Lab in 2020 and 2021 confirmed this by identifying multiple Rainforest Alliance certified farms utilizing child labor.[106] One farmer whose cooperative is Rainforest Alliance certified explained: "They tell us that children are not supposed to work but they are the ones who help me feed the family. Children work in the plantations because the cooperatives and companies treat us so badly that we need to make children work on the plantations."[107] Clearly, Rainforest Alliance certification did not improve the life of this farmer, his family, or children.[108]

124.    Rainforest Alliance does not even require a minimum farmgate[109] price to guarantee at least a certain level of income for farmers. Instead, Rainforest Alliance requires buyers

---

[103] V. Ingram, F. van Rijn, Y. Waarts, M. Dekkers, B. de Vos, T. Koster, R. Tanoh & A. Galo, Towards Sustainable Cocoa in Côte d'Ivoire: The Impacts and Contribution of UTZ Certification Combined With Services Provided by Companies 62 (2017), https://research.wur.nl/en/publications/towards-sustainable-cocoa-in-cote-divoire-the-impacts-and-contrib.

[104] Peter Whoriskey & Rachel Siegel, *Cocoa's Child Laborers*, Wash. Post (June 5, 2019), https://www.washingtonpost.com/graphics/2019/business/hershey-nestle-mars-chocolate-child-labor-west-africa/.

[105] *Id.*

[106] *CAL Finds Evidence of Child Labor on Rainforest Alliance Certified Farms*, Corp. Accountability Lab (Oct. 25, 2021), https://corpaccountabilitylab.org/calblog/2021/10/25/cal-finds-evidence-of-child-labor-on-rainforest-alliance-certified-farms.

[107] *Id.*

[108] *See supra* ¶ 78.

[109] "Farmgate price" refers to the price of an agricultural product when purchased directly from the producer.

to pay a $70 premium on each metric ton of cocoa.[110] As for the minimum farmgate price, that is to be determined by local laws.

125.    For these reasons, Nestlé's claim that Rainforest Alliance certification makes its Products sustainably or responsibly sourced is false and misleading. A reasonable consumer would not expect products with a sustainability certification to have been produced with child labor or by drastically underpaying farmers.

**D.    Nestlé Is Not Committed to Eradicating Child Labor From Its Supply Chains.**

126.    At this point, Nestlé's commitments to eradicating child labor go back more than two decades, but there is little to show for it. In 2005, cocoa industry leaders, including Nestlé, admitted the goals of the 2001 Harkin-Engel Protocol would not be "fully met" by the 2005 deadline. However, they assured Sen. Harkin and Rep. Engel they were "committed to achieving a certification system . . . within three years." Then in 2008, industry leaders again extended their self-imposed deadline by two years. In 2010, the Nestlé and its peers delayed the implementation date by a full decade to 2020 and modified the goal to reducing the use of child labor in the cocoa industry by 70%. That goal was not met either.

127.    Now, continuing such behavior into 2025, Nestlé claims it will have 100% of its cocoa "sustainably sourced" through the Nestlé Cocoa Plan by the end of the year.[111] But it is clear that the Nestlé Cocoa Plan is not a viable path towards the eradication of child labor. And child labor is not sustainable.[112] So once again, another goal will be missed.

---

[110] *Does Rainforest Alliance Certification Guarantee a Minimum Price for Certified Crops?*, Rainforest All. (June 25, 2021), https://www.rainforest-alliance.org/business/certification/does-rainforest-alliance-certified-guarantee-minimum-price/.

[111] Nestlé, Tackling Child Labor: 2019 Report 76 (2019), https://www.nestle.com/sites/default/files/2019-12/nestle-tackling-child-labor-report-2019-en.pdf.

[112] *See supra* note 4 and accompanying text.

128.    As 2025 is nearly half over and Nestlé is nowhere near accomplishing its promises, we can expect Nestlé and the other major companies merely to award themselves another major extension of time, during which Nestlé will reassure consumers of its good intentions that have yet to be converted to action.

129.    So long as Nestlé refuses to pay its farmers the price that is necessary to achieve a living income, child labor will persist in its supply chain. Yet Nestlé is avoiding this at every turn— whether by denying farmers full payment for the actual weight of their bags, or by using a certification system that doesn't guarantee farmers a minimum farmgate price, or by distracting the public with an Income Accelerator Program that fails to guarantee a living income or anything close to it.

130.    Nestlé's behavior does not comport with what a reasonable consumer would expect of a company that "take[s] action against any violations of human rights in our operations and value chain, with zero tolerance to child labor, forced labor and modern slavery."[113] It does not comport with a company that is "firmly opposed to all forms of child exploitation and [is] committed to preventing and eliminating child labour wherever it occurs in [its] supply chain."[114] It does not comport with a company that seeks to address the "root causes" of child labor in its supply chain.[115] All of Nestlé's representations in this vein are false and misleading to consumers.

IV.    **Nestlé's Representations Regarding Its Commitments and Actions with Respect to Child Labor and the Responsible Sourcing of Its Products Are Material.**

131.    Nestlé knows that consumers care about whether the products they purchase are sustainably sourced and free of labor exploitation. Nestlé also knows that consumers care about

---

[113] Nestlé, Corporate Business Principles 4 (2020), https://www.nestle.com/sites/default/files/asset-library/documents/library/documents/corporate_governance/corporate-business-principles-en.pdf.

[114] Nestlé, Tackling Child Labour: 2017 Report 7 (2017), https://www.nestle.com/sites/default/files/asset-library/documents/creating-shared-value/responsible-sourcing/nestle-cocoa-plan-child-labour-2017-report.pdf.

[115] *How Is Nestlé Tackling Child Labor Risk?*, Nestlé, https://www.nestle.com/ask-nestle/human-rights/answers/nestle-child-labour-supply-chains (last visited May 30, 2025).

the ethics of the company they purchase a product from. For this reason, companies like Nestlé make many representations about both the sourcing of their products and their corporate values.

132.    Because consumers care about their products being free of labor exploitation, representations regarding child labor, forced labor, labor conditions, and fair compensation are material to consumers.

133.    Because consumers care about the ethics of the company they purchase a product from, representations regarding a company's values and intentions in carrying out those values are also material to consumers.

134.    According to a survey by Mintel, 56% of Americans would stop purchasing from companies they believe are unethical, and 35% would do so even if there are no substitutes for the brand.[116] Additionally, 63% "feel that ethical issues are becoming more important" with respect to spending habits.[117]

135.    A joint survey by Food Marketing Institute, Grocery Manufacturers Association, and Deloitte Consulting LLP of 5,000 consumers showed that significant segments of the national consumer base prioritize "more transparency from food producers and retailers," "accountability and transparency through the entire food supply chain," and "fair treatment of workers."[118]

136.    A survey by OpenText found that "81 percent" of consumer respondents said that "purchasing ethically sourced and/or produced products matters,"[119] and a study from McKinsey

---

[116] *56% of Americans Stop Buying From Brands They Believe Are Unethical*, Mintel (Nov. 18, 2015), https://www.mintel.com/press-centre/56-of-americans-stop-buying-from-brands-they-believe-are-unethical/.
[117] *Id.*
[118] *Consumer Survey Shows Changing Definition of Food Safety*, Food Safety News (Feb. 4, 2016), https://www.foodsafetynews.com/2016/02/123246/.
[119] Steve Banker, *Do Consumers Care About Ethical Sourcing?*, Forbes (Oct 5, 2021), https://www.forbes.com/sites/stevebanker/2021/10/05/do-consumers-care-about-ethical-sourcing/?sh=4c6fe92c5f50.

and NielsenIQ found that consumers are willing to pay more for an ethical product based on the product marketing and packaging.[120]

137.    With respect to child labor, 77% of consumers would no longer purchase from brands they knew were employing child labor, even if the consumers had often bought from these brands in the past.[121] Fifty-five percent of consumers say they would pay more for items they know are not made with child labor.[122]

## CAUSE OF ACTION

### *Violations of the District of Columbia Consumers Protection Procedures Act*

138.    IRAdvocates incorporates by reference all of the allegations of the preceding paragraphs of this Complaint.

139.    IRAdvocates is a nonprofit, public interest organization that brings these claims on behalf of the general public and District consumers. *See* D.C. Code § 28-3905(k)(1)(D)(i).

140.    Through § 28-3905(k)(1)(D)(i), the D.C. CPPA explicitly allows for public-interest organizational standing even beyond that which is afforded pursuant to § 28-3905(k)(1)(C) and allows a public interest organization to stand in the shoes of a consumer to seek relief from any violation of the CPPA.

141.    Nestlé is a "person" and a "merchant" that provides "goods" within the meaning of the CPPA. *See id.* § 28-3901(a), (1), (3), (7).

142.    Nestlé has advertised and marketed, and continues to advertise and market, its cocoa Products as being sourced from supply chains that meet certain labor conditions and

---

[120] *Consumers Care About Sustainability—and Back It Up With Their Wallets*, McKinsey & Co. (Feb. 6, 2023), https://www.mckinsey.com/industries/consumer-packaged-goods/our-insights/consumers-care-about-sustainability-and-back-it-up-with-their-wallets.

[121] *Majority (55%) of Americans Willing to Pay More for Clothing Not Made Using Child Labor*, Ipsos (July 18, 2013), https://www.ipsos.com/en-us/majority-55-americans-willing-pay-more-clothing-not-made-using-child-labor.

[122] *Id.*

standards, when in fact, investigations reveal that Nestlé's supply chains are reliant on child labor and that many of the represented monitoring, remediation, and economic empowerment programs are either nonexistent or ineffective, and that remediation documents have been falsified. Defendant has further misled consumers to believe that that it is committed to and making progress on eradicating child labor from its supply chains, when in fact that is not the case.

143.    Defendant has violated the CPPA by "represent[ing] that goods . . . have a source . . . [or] . . . characteristics . . . that they do not have"; "represent[ing] that goods . . . are of a particular standard, quality, grade, style, or model, if in fact they are of another"; "misrepresent[ing] as to a material fact which has a tendency to mislead"; "fail[ing] to state a material fact if such failure tends to mislead"; "us[ing] innuendo or ambiguity as to a material fact, which has a tendency to mislead"; and "advertis[ing] . . . goods . . . without the intent to sell them as advertised." *See id.* § 28-3904(a), (d), (e), (f), (f-1), (h).

## JURY TRIAL DEMAND

144.    Plaintiff IRAdvocates hereby demands a jury trial.

## PRAYER FOR RELIEF

145.    ***Wherefore***, Plaintiff IRAdvocates prays for judgment against Nestlé and requests the following relief:

146.    A declaration that Defendant Nestlé's conduct is in violation of the CPPA;

147.    An order enjoining Defendant Nestlé's conduct found to be in violation of the CPPA; and

148.    An order granting Plaintiff IRAdvocates' costs and disbursements, including reasonable attorneys' fees and expert fees, and prejudgment interest at the maximum rate allowable by law.

Respectfully submitted this 30th day of May 2025,

*/s/ Terrence P. Collingsworth*
Terrence P. Collingsworth (D.C. Bar No. 471830)
Executive Director
**INTERNATIONAL RIGHTS ADVOCATES**
621 Maryland Ave. NE
Washington, D.C. 20002
T: (202) 543-5811
tc@iradvocates.org

Kim E. Richman (D.C. Bar No. 1022978)
**RICHMAN LAW & POLICY**
1 Bridge St. Suite 83
Irvington, NY 10533
T: (914) 693-2018
krichman@richmanlawpolicy.com

*Counsel for Plaintiff*

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

INTERNATIONAL RIGHTS ADVOCATES, INC.
_____
Plaintiff

vs.                                                      2025-CAB-003482

NESTLÉ USA, INC.                                      Case Number _____
_____
Defendant

**SUMMONS**

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Terrence P. Collingsworth
_____
Name of Plaintiff's Attorney

INTERNATIONAL RIGHTS ADVOCATES                      Clerk of the Court

Address                                              By _____
621 Maryland Ave. NE, Washington, D.C. 20002                                    Deputy Clerk

2025435811                                           Date _____ **June 2, 2025**
_____
Telephone

如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주십시요.    የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                              Super. Ct. Civ. R. 4





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov**

_____
                                    Demandante

        contra

                                                    Número de Caso: _____

_____
                                    Demandado

**CITATORIO**

Al susodicho Demandado:

        Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

        A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

                                    *SECRETARIO DEL TRIBUNAL*

_____
Nombre del abogado del Demandante

                                    Por: _____

_____
Dirección                                           Subsecretario

_____
                                    Fecha _____
Teléfono

如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면 (202) 879-4828 로 전화하십시오        የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO*.

        Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

                        Vea al dorso el original en inglés
                        See reverse side for English original

CV-3110 [Rev. June 2017]                                           Super. Ct. Civ. R. 4

# Superior Court of the District of Columbia

CIVIL DIVISION - CIVIL ACTIONS BRANCH

INFORMATION SHEET

INTERNATIONAL RIGHTS ADVOCATES, INC.,
_____
Plaintiff(s)

Case Number: ___2025-CAB-003482___

vs

Date: __5/30/25_____

NESTLÉ USA, INC.
_____
Defendant(s)

☐ One of the defendants is being sued
in their official capacity.

| | |
|---|---|
| Name: *(Please Print)* <br> Terrence P. Collingsworth | Relationship to Lawsuit <br> ☑ Attorney for Plaintiff |
| Firm Name: <br> INTERNATIONAL RIGHTS ADVOCATES | ☐ Self (Pro Se) |
| Telephone No.:          DC Bar No.: <br> (202) 543-5811        471830 | ☐ Other: _____ |

TYPE OF CASE:    ☐ Non-Jury        ☐ 6 Person Jury        ☑ 12 Person Jury

Demand: $_____                    Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:_____    Judge: _____    Calendar #:_____

Case No.:_____    Judge: _____    Calendar #:_____

---

NATURE OF SUIT:    *(Check One Box Only)*

**CONTRACT**
☐ Breach of Contract
☐ Breach of Warranty
☐ Condo/Homeowner Assn. Fees
☐ Contract Enforcement
☐ Negotiable Instrument

**COLLECTION/INS. SUB**
☐ Debt Collection
☐ Insurance Subrogation
☐ Motion/Application for Judgment by Confession
☐ Motion/Application Regarding Arbitration Award

**EMPLOYMENT DISPUTE**
☐ Breach of Contract
☐ Discrimination
☐ Wage Claim
☐ Whistle Blower
☐ Wrongful Termination

---

**REAL PROPERTY**
☐ Condo/Homeowner Assn. Foreclosure
☐ Declaratory Judgment
☐ Drug Related Nuisance Abatement

☐ Ejectment
☐ Eminent Domain
☐ Interpleader

☐ Other
☐ Quiet Title
☐ Specific Performance

☐ **FRIENDLY SUIT**
☐ **HOUSING CODE REGULATIONS**
☐ **QUI TAM**
☐ **STRUCTURED SETTLEMENTS**

---

**ADMINISTRATIVE PROCEEDINGS**
☐ Administrative Search Warrant
☐ App. for Entry of Jgt. Defaulted Compensation Benefits
☐ Enter Administrative Order as Judgment
☐ Libel of Information
☐ Master Meter
☐ Petition Other

☐ Release Mechanics Lien
☐ Request for Subpoena

**MALPRACTICE**
☐ Medical – Other
☐ Wrongful Death

**AGENCY APPEAL**
☐ Dangerous Animal Determination
☐ DCPS Residency Appeal
☐ Merit Personnel Act (OEA)
☐ Merit Personnel Act (OHR)
☐ Other Agency Appeal

☐ **APPLICATION FOR INTERNATIONAL FOREIGN JUDGMENT**

CV-496/February 2023

# Information Sheet, Continued

**CIVIL ASSET FORFEITURE**
- ☐ Currency
- ☐ Other
- ☐ Real Property
- ☐ Vehicle

**NAME CHANGE/VITAL RECORD AMENDMENT**
- ☐ Birth Certificate Amendment
- ☐ Death Certificate Amendment
- ☐ Gender Amendment
- ☐ Name Change

**TORT**
- ☐ Abuse of Process
- ☐ Assault/Battery
- ☐ Conversion
- ☐ False Arrest/Malicious Prosecution
- ☐ Libel/Slander/Defamation
- ☐ Personal Injury
- ☐ Toxic Mass
- ☐ Wrongful Death (Non-Medical Malpractice)

**GENERAL CIVIL**
- ☐ Accounting
- ☐ Deceit (Misrepresentation)
- ☐ Fraud
- ☐ Invasion of Privacy
- ☐ Lead Paint
- ☐ Legal Malpractice
- ☐ Motion/Application Regarding Arbitration Award
- ☐ Other - General Civil

- ☐ Product Liability
- ☐ Request for Liquidation
- ☐ Writ of Replevin
- ☐ Wrongful Eviction

**CIVIL I/COMPLEX CIVIL**
- ☐ Asbestos

**MORTGAGE FORECLOSURE**
- ☐ Non-Residential
- ☐ Residential

**STATUTORY CLAIM**
- ☐ Anti – SLAPP
- ☑ Consumer Protection Act
- ☐ Exploitation of Vulnerable Adult
- ☐ Freedom of Information Act (FOIA)
- ☐ Other

**TAX SALE FORECLOSURE**
- ☐ Tax Sale Annual
- ☐ Tax Sale Bid Off

**VEHICLE**
- ☐ Personal Injury
- ☐ Property Damage

- ☐ **TRAFFIC ADJUDICATION APPEAL**
- ☐ **REQUEST FOR FOREIGN JUDGMENT**

_/s/Terrence P. Collingsworth_
_____
Filer/Attorney's Signature

5/30/25
_____
Date